# EXHIBIT  C

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

**DEAN WESTON** and
**ENGINEERING INTERESTS, INC.,**

       Plaintiffs,                Case No. 16-        - CK

v.                                   Hon.

**CARL Le SOUEF, HYDROGEN MASTER
RIGHTS LIMITED, SOMNIO GLOBAL, L3C,
SOMNIO GLOBAL, LLC, SOMNIO DOMUS, LLC,
CSQUARED INNOVATIONS, LLC, PRAVANSU MOHANTY,
BREAKTHROUGHS FOR HUMANITY MANAGEMENT
INC., COPPER HARBOR BREAKTHROUGHS, INC.,**
jointly and severally,

       Defendants.

_____/

**WILLIAM DOBREFF (P35263)**
Attorney for Plaintiffs
44511 N. Gratiot Avenue
Clinton Twp., MI 48036
(586) 838-3880

_____/

### COMPLAINT AND JURY DEMAND

     **NOW COME** Plaintiffs and do hereby state as follows:

     1.     Plaintiff Dean Weston is a resident of the State of Michigan, County of Oakland.

     2.     Plaintiff Engineering Interests, Inc. has its principal office in the State of Michigan,

County of Oakland, and Weston is the managing member.

     3.     The amount in controversy is in excess of Twenty-five Thousand ($25,000) Dollars.

     4.     Defendant Breakthroughs for Humanity Management, Inc. does business in the

State of Michigan, County of Oakland.

5.      Defendant Copper Harbor Breakthroughs, Inc. has its principal office in and does business in the State of Michigan, County of Oakland.

6.      Defendant Pravansu Mohanty resides at 838 Morning Ct. Canton, Michigan, 48188 and does business and has offices in the State of Michigan, County of Oakland.

7.      Defendant Hydrogen Master Rights Limited is a Delaware corporation and does business in the State of Michigan, County of Oakland, with an office in Ohio and uses the offices of CSquared in Oakland County, Michigan.

8.      Defendant CSquared Innovations, LLC does business in Oakland County and has its principal office and place of business at 45145 12 Mile Road, Novi, Michigan.

9.      Defendant Carl Le Souef is a resident of Australia and does business in the State of Michigan, County of Oakland, with an office in Novi.

10.     Defendant Somnio Global, LLC does business in Oakland County and has its office and principal place of business at 45145 12 Mile Road, Novi, MI 48377.

11.     Defendant Somnio Global, L3C has its principal offices in and does business in the State of Michigan, County of Oakland.

12.     Defendant Somnio Domus, LLC has its principal offices in and does business in the State of Michigan, County of Oakland.

13.     The torts occurred in the State of Michigan, County of Oakland.

14.     The documents referred to in the Complaint are too voluminous, making it impractical to attach copies of the documents, which are in the possession of defendants.

15.     Hydrogen Master Rights Limited, CSquared Innovations, Somnio Global, LLC, Breakthroughs for Humanity, Inc., CSquared Innovations, Copper Harbor Breakthroughs, Inc.,

Somnio Global, L3C and the other entities are alter egos of or a cat's paw for Mohanty and Le Souef.

16.     Carl Le Souef and Pravansu Mohanty set up entities or trusts to defraud Plaintiff, hide and/or divert the technology or benefits from the technology, including:

a)     Somnio Global LLC;

b)     Hydrogen Master Rights Ltd;

c)     CSquared Innovations, LLC;

d)     Breakthroughs for Humanity Management Inc.;

e)     Water Resources Group Limited;

f)     Dilato Investments PTY Ltd;

g)     Global Energy Conversion LLC;

h)     Perturbo Holdings Ltd.

i)     Sospito Holdings, Ltd.

j)     Copper Harbor Breakthroughs Inc.;

k)     Linus Yale Research Business; Property Fund Trust;

l)     Mridangam Research Intellectual Property Fund Trust;

m)     and other entities and trusts.

17.     Defendant Pravansu Mohanty was acting as an express or implied agent of Le Souef and/or Hydrogen Master Rights Limited, LLC.

18.     Defendants, Pravansu Mohanty, Carl Le Souef, Breakthroughs for Humanity Management, Inc., CSquared Innovations, Copper Harbor Breakthroughs, Inc., Somnio Domus,

Somnio Global L3C, Somnio Global LLC, Hydrogen Master Rights Limited, were engaged in a joint venture.

19.     Hydrogen Master Rights is controlled by Carl Le Souef, its president; the other owner members originally were Tracy Coats, Pravansu Mohanty and Rod Adler.

20.     Mohanty and Le Souef have eliminated or diluted Coats' and Adler's interest in Hydrogen Rights Limited.

21.     Tracy Coats was, at all times, acting as an agent and owner of IBKE, then HMR.

22.     The use and testing of technology in Michigan, along with photos of Weston's vehicle, were used as success stories to market the technology:

a)     Dean Weston, a seasoned automotive expert, tested numerous solutions, mounted a pre-production unit on his Hummer and became one of our strongest supporters;

b)     Ralph Keller, a key member of the engineering team, contributed to the development of the technology enabling the production of a substantial amount of pure hydrogen out of uncompromised water.

23.     In February of 2009, Weston and Manos met in Michigan and reached an agreement that Weston would receive one-third interest in net proceeds of any sale of the technology; $20,000 per month; and expenses reimbursed (which included insurance) in exchange for Weston providing services, including developing the technology, marketing the technology, adapting the technology for use on vehicles, testing the technology and other services.

24.     In February of 2009, Plaintiff Weston began helping Manos and Picot design, build, test and invest in a fuel cell technology, electrolyte formulas, hydrogen cell and other technology.

25.     In August of 2009, Weston sent $65,000 to Innova LLC to develop the hydrogen and electrolyte technologies.

26.     In January of 2010, Weston had contact with Mohanty about his involvement with the technology.

27.     On February 24, 2010, Manos's email set forth:  this starts our DBHS project with U of M.  They are very excited and moving forward...they are full believers in our project.

28.     Weston began meeting with Mohanty in February or March of 2010 and brought Mohanty up to speed with the work and developments Weston and Keller had on the hydrogen cell and electrolyte technology.

29.     On March 23, 2010, a mutual nondisclosure agreement was reached between DBHS and Regents of U of M relating to DBHS technology as confidential and was identified as transfer file numbers 4306, 4317, 4318, 4422, 426 requiring:

        a)      to hold the proprietary information in trust confidence;

        b)      not to make use of the property except to evaluate the proprietary
                information;

        c)      not to reverse engineer any of the proprietary information.

30.     On March 23, 2010, Manos, Picot and or DBHS signed an NDA with U of M as a result of Mohanty, who was a professor at U of M at the time.

31.     In April of 2010, Picot sent an email to Dean Weston and Ralph Keller that:

        a)      he has two groups coming to Michigan for presentations and he
                needs our success to make this happen;

        b)      this will lead to an immediate ratification of substantial agreement,
                concluding the email; that there is no need to outline the fact that
                everyone will be rewarded accordingly.

32.     On May 5, 2010, Mohanty emailed Plaintiff requesting information on a Glycol problem; don't drop it; it looks interesting and we may find a solution.

33.     On May 5, 2010, Mohanty reviewed and revised DBHS' statement regarding the electrolyte:

> a)     Is environmentally benign;
>
> b)     doesn't pose health risks;
>
> c)     has a low freezing point.

34.     On May 24, 2010, Weston emailed Manos, Picot and Mohanty:

> Pravansu; here is summary of the 96 hour run; things look great.  I have the fluid and would like to drop it off to you; when are you available?

35.     On June 22, 2010, CSquared Innovations, LLC received $40,000 from DBHS, LLC for design services, prototype generator and testing services.

36.     On July 2, 2010, Weston emailed Mohanty, Picot and Manos regarding testing at Roush.

37.     A provisional patent regarding the technology was filed by Mohanty on July 22, 2010.

38.     The patent was held under the names of two private citizens; Mohanty and Manos filed personally.

39.     On July 22, 2010, CSquared Innovations received $20,000 for testing services, technical support and system drawing.

40.     On August 5, 2010, Mohanty e-mailed Manos and Picot:

> a)     Dr. Terry Hoffer is worried about U of M's involvement;
>
> b)     We shouldn't isolate ourselves from U of M;

c)      The credibility that U of M provides us is much more than the 300 thousand he is promising;

d)      Although C Squared is the buffer, we should capitalize on the credibility of U of M;

e)      I always sell C Squared as a start up from U of M, that is the smart business strategy.

41.     On August 16, 2010, CSquared Innovations received $25,000 from DBHS for new IP concept development and additional funds were paid after that date.

42.     In August of 2010, Manos and Picot were working on a contract with CSquared.

43.     On September 12, 2010, Weston met with Tracy Coats, a majority owner of HMR Hydrogen Master Rights, Ltd (hereinafter referred to as HMR), a Delaware company at the time, with offices in Michigan and potential purchaser of the technology.

44.     There was an Exclusive Agency Representation Agreement dated September 14, 2010 between International Business Knowledge Exchange with Manos and Picot.

45.     On October 26, 2010, Tracy Coats directed Weston to handle the physical logistics and to ensure internet linkage was working perfectly for the Skype presentation to China.

46.     On January 14, 2011, there was an exclusive license agreement between significant Australian Energy Intellectual Property Trust Licensor signed by Julia Blair as Trustee and International Business Knowledge Exchange, Ltd. Licensor signed by Tracy Coats, with vendors Manos and Picot assigning the technology, some aspects of which are described in US Provisional Application serial No. 611365,813, to make, use, sell, offer for sale, develop, use and commercialize the inventions and technologies throughout Australia and New Zealand in exchange for 5 million dollars.

47.     On January 14, 2011, there was a supply agreement between Picot and Manos as vendors and International Business Knowledge Exchange Limited signed by Tracy Coats as chairman of the board for a term of five years, which references product as Hydrogen and/or Oxygen generating sale price 20% above costs of manufacture.

48.     On January 14, 2011, an exclusive assignment of intellectual property was made between Manos and Picot with Significant Australia Intellectual Property Trust signed by Julia Blair Trustee relating to:

> a)     Proprietary Fluids;
>
> b)     Proprietary Electrolyte Concentrates;
>
> c)     Proprietary Commercial Fluid

based on Electrolyte Concentrates and Hydrogen and Oxygen Generators.

49.     On January 14, 2011, there was an authorization by Picot, Manos and Significan Australian Intellectual Property Trust to release in encrypted form to Pravansu Mohanty of Detroit, Michigan to deliver to Iron Mountain Intellectual Property acting as an escrow agent and discuss the formulations and all other processes in the manufacturer of proprietary fluids and any proprietary fluid concentrates.

50.     A Supply Agreement was effective as of January 14, 2011 between Picot and Manos and International Business Knowledge Exchange Ltd for products being all proprietary fluids, proprietary electrolyte concentrates and/or proprietary commercial fluids based on proprietary electrolytes concentrates for the production of hydrogen and oxygen gases from water or other sources as well as hydrogen and oxygen generators.

51.     On February 4, 2011, Mohanty emailed Manos and Picot:

a)   Here are the results we have been waiting for all these days;

b)   The last slide did the job on Carl; it's a plot between fuel consumption versus when rpm increased the difference in the fuel consumption increased drastically;

c)   I am very pleased when we tie the hydrogen generation amount to deal with the rpm, things look even better.

52.   On February 4, 2011, Mohanty emailed Bernard Picot confirming the technology worked.

53.   In March of 2011, Weston helped Mohanty move a piano to his house.

54.   In April of 2011, Weston met with Mohanty several times on design and new plates.

55.   On May 29, 2011, Mohanty emailed Picot and Manos; it was nice meeting you; just to recap, our strategy should be:

a)   File a patent based on the reaction and disconnect it from the application;

b)   There exist application patents and we won't gain much attaching it to the application;

c)   We bring additional benefits in terms of design simplicity injection schemes and coatings;

d)   Let Tracy and his group develop the market, should the need arise we will pull it out and go to court;

e)   If the language is related to lowballing the technology to take it free, there is no accommodation;

f)   I can see the benefit of having it all under 1 umbrella;

g)   I doubt they would propose to take everything for free;

h)   If the proposal is friendly we will continue the friendship, it is ugly we will respond accordingly;

56.     On June 1, 2011, an Operations Management Agreement regarding the technology was created between:

      a)      Copper Harbor Breakthroughs Inc.;

      b)      Breakthroughs for Humanity Management Inc.

Under which manager was to:

      a)      Use its best efforts to manage the day-to-day operations of the business;

      b)      Manager shall be entitled to be paid $50,000 to 25% of the future selling price of business under whichever is greater.

57.     In July 2011, Mohanty told Manos technology would be difficult to protect in the public realm.

58.     Prior to the sale, Hydrogen Master Rights, Ltd., Mohanty and Le Souef knew of Plaintiff's 1/3 interest in the technology.

59.     Mohanty was attempting to take the technology and the investment money to benefit Mohanty and Le Souef.

60.     In July of 2011, Mohanty told Weston things were good, relating to the technology.

61.     On July 13, 2011, Le Souef emailed Picot and Manos regarding the ongoing relationship and to ensuring the financial rewards that may come from this project.

      a)      the agreement we reached does not per se excite me;

      b)      Tracy and Pravansu have accepted the agreement;

      c)      will devote to the project and ensure maximum protection of our mutual interests;

d)      you will each personally through Significan and any other appropriate entity transfer 100% of all IP associated with and outlined in your option agreement Pravansu;

e)      immediately upon executing of this agreement and transfer the sum of $500,000 will be transferred to you;

f)      1.5 million paid upon validation by Pravansu that the design generation technology share of 500 million of commercial revenue;

g)      additional shares of the profits will be paid.

62.      Mohanty intentionally did not notify Manos that they had to file a utility patent on or before July 22, 2011 or it would lapse because Mohanty intended it to lapse.

63.      Upon information and belief, in August 2011, Manos and Picot entered into negotiations with Coats and Carl Le Souef, a resident of Australia and part owner of HMR, to purchase the technology.

64.      Mohanty told Weston in the fall of 2011:

a)      they have good success with the technology on a vehicle;

b)      they brought the approved testing equipment to confirm these results.

65.      In December of 2011, Plaintiff contacted Defendant Mohanty and asked him what was going on with the technology; he said he was uncomfortable with the whole situation and Plaintiff should contact Picot and Manos.

66.      Mohanty asked Plaintiff to disclose to him the electrolyte formula, which Plaintiff did and Mohanty confirmed it was the formula.

67.      On about December 21, 2011, Linus Yale Research Business Property Fund gifted 200,000 to the college of Engineering and computer science at the university of Michigan Dearborn for this project.

68.     The negotiations were successful and the contract was executed, with an effective date of December 2011.

69.     On March 14, 2012, a Mutual Cooperation Agreement was signed between Weston and HMR through Tracy Coats regarding the technology to cooperate in the claims each had against Manos and Picot.

70.     Through the Mutual Cooperation Agreement, HMR and Carl Le Souef were aware of Weston's development and ownership of the technology, including a right of 1/3 of the sale proceeds and more than $800,000 in investment lost wages, time and use of the offices and assets of Engineering Interests' vehicles, employee time and business trips.

71.     On August 12, 2013, Somnio Global L3C announced in the *Daily Tribune* an intent to expand our research into using subzero temperatures to preserve artificial vial tissue with the goal of producing cell and oxygen replacements.

72.     On August 12, 2013, Mohanty posted on the Web that Somnio Global L3C wants to expand our research into using subzero temperature to preserve artificial tissues with the goal of producing cell and urging replacement; the payment project director is Maridass Balasubra Manion.

73.     On October 31, 2013, the Defendants created Somnio Global, L3C, located at 45145 W. 12 Mile Road, Novi, Michigan, to market and sell low temp technology for multiple purposes, including preserving artificial tissue for cell and organ replacement.

74.     The purpose listed for Somnio Global, L3C was to provide assistance and advice on innovation, product development, management, commercialization and protection of technical advances in fields of energy and environment.

75.     There was a patent application – serial no. 61 / 365,813, put in Pravansu Mohanty's and Dave Manos' name.

76.     Upon information and belief, Mohanty and Le Souef purchased the building located at 45145 12 Mile Road, Novi, Michigan, for more than six million ($6,000,000) dollars through Somnio Domus, LLC using in part funds from Weston, Picot, Manos and DBHA.

77.     During the course of the project Manos, Weston and Picot referred to each other as partners and the "three street fighters".

78.     Manos repeatedly confirmed Weston's one-third interest in front of third parties and eventually Manos, Julie Blair, as Trustee, DBHS, Significan and Picot transferred their interests to Weston.

79.     Manos and Picot used Weston's Engineering Interests' office for marketing, testing and developing the technology.

80.     Picot and Manos used Engineering Interests' office when in Michigan.

81.     Picot sent prospective purchasers of the technology to Weston's and Engineering Interests' offices to view the technology.

82.     Weston met with Coats in Dearborn, Michigan, participated in an online Skype, to a potential investor in China.

83.     Plaintiff Weston was instrumental in the sale of the technology to Tracy Coats' group HMR:

       a)      met with Tracy Coats on multiple occasions;

       b)      demonstrated the technology, Coats videotaped the presentation;

       c)      doing Skype presentations to China;

d)      met with him at U of M on several occasions;

e)      notified him of Weston's 1/3 interest.

84.     Coats told Weston he would be used to launch the technology worldwide.

85.     The developmental work for the technology was done primarily at Engineering Interests' offices in Sterling Heights, Michigan.

86.     Additional testing was done at Roush Industries and at U of M, with Weston being the primary contact.

87.     Weston's vehicles or vehicles leased by Weston were used to test and develop the technology.

88.     Plaintiff Dean Weston was heavily involved in the testing of the product at Roush Industries, U of M and Engineering Interests.

89.     Weston raised $450,000 for investment into the project in Michigan that was used to pay for the Mohanty and/or CSquared testing and development of the technology.

90.     Mohanty used the $450,000 raised by Weston as seed money for CSquared; Mohanty put the technology into Breakthroughs for Humanity Management Inc. and other shell entities to conceal his plan to take Plaintiff's technology without paying for it.

91.     Upon information and belief, these funds were used for CSquared projects, funding and costs.

92.     Weston performed the vast majority of his services in Oakland and Macomb County, Michigan.

93.     Upon information and belief, the sale of the technology also resulted in payments to U of M, Dr. Mohanty, his company CSquared and or other entries created by Mohanty and or Le Souef.

94.     Counsel for Picot and Manos confirmed during oral argument in the lawsuit with Manos and Picot that payments were sent from Carl Le Souef to intellectual property trusts located in Australia and Wyoming for Picot and Manos rather than to Weston.

95.     The owner of the technology is listed as Copper Harbor Breakthroughs for Humanity Inc., and the manager is listed as Breakthroughs for Humanity Management Inc.; Pravansu Mohanty is the president of both entities.

96.     Linus Yale Research Business Property Fund Trust's purpose was to license the exclusive entire right title and interest in and to the business property owned by the beneficial interest holder.

97.     When the initial payment of the first $400,000 was made to purchase the technology, Le Souef was very happy with the deal.

98.     Upon information and belief, there was a coverup of the fire in December of 2012 to conceal what was occurring with the technology and a story made up regarding carbon nanoparticles research being the cause of the fire as a secret project funded by government grants from the armed services and that the investor, Carl Le Souef, is somehow connected to the technology.

99.     Mohanty and Le Souef own the building through Somnio Domus, LLC at 45145 West 12 Mile Novi, Michigan that is worth 12 million dollars.

100.    Picot and Manos used the Engineering Interests office as their offices when in Michigan.

101.    Plaintiff Weston was an owner of the technology, along with Bernard Picot and David Manos.

102.    Significan, DBHS, Blair, Manos and Picot assigned interests to Weston in the:

  a)    proprietary fluids alone and used in industrial applications;

  b)    any chemistry related to the fluids;

  c)    proprietary electrolyte concentrations;

  d)    proprietary commercial fluids and fuels;

  e)    all formulas for the electrolyte fluids and fuels;

  f)    any and all future improvements;

  g)    any and all related benefits;

  h)    all future royalty payments and revenue.

103.    Pravansu Mohanty intended to eliminate Weston's involvement in the technology and set forth on that plan.

104.    Tracy Coats and Carl Le Souef inspected the technology at the Macomb office.

105.    Defendant Hydrogen Master Rights Ltd., with Carl Le Souef, bought technology from Bernard Picot and David Manos, without purchasing Plaintiff Weston's interest.

106.    Defendant Mohanty was hired and paid to develop, test and protect the intellectual property by Weston, Picot, Manos and DBHS.

107.    Defendant Mohanty told Weston he was very confident he would make the technology work on several occasions.

108.    Defendant Mohanty owed Plaintiff a duty to use research to the benefit of Weston, Picot, Manos and DBHS.

109.    All the investors came to the Macomb County office to inspect the property and see it function.

110.    Tracy Coats, Dave Manos, Bernard Picot and Steve Klochko drove around in Macomb County in Dean's Nissan Morano, which was equipped with the technology.

111.    Weston had developed the retrofit device to use and attach the technology to vehicles and other innovations related to the technology.

112.    Mohanty was paid more than $500,000 to develop and/or improve the hydrogen and electrolyte technologies.

113.    Plaintiff Weston met with Dr. Pravansu Mohanty, an expert in plasma coatings, mechanical engineering and fuel cell technologies.

114.    Mohanty agreed to work with Weston to develop, improve and validate and protect the technology.

115.    The subject technology had valuable and diverse commercial uses including:

    a)    Deicing agent to replacing Glycol;

    b)    Coolant;

    c)    Antifreeze;

    d)    Preservation – Food + Beverage;

    e)    Anti-Corrosive Applications;

    f)    Anti-Mold Properties;

    g)    Storing of Energy;

> h)     Preservation used to add to other products to enhance Patent ability;
>
> i)     other uses.

116.    The subject technology was tested by Mohanty and would not freeze at temperatures ranging from 38 degrees to 60 degrees below zero.

117.    Dan Heindrich invested money to DBHS based on conversations he had with Mohanty.

118.    The provisional patent regarding the technology was not assigned to a company and Mohanty concealed from Manos that the patent was never assigned to DBHS.

119.    All the trust agreements relative to the technology were invalid as Mohanty knew the patent was in the individuals of Mohanty's and Manos' names and not assigned to the company.

120.    Mohanty had a plan to have Manos and Picot eliminate Weston and then have Le Souef eliminate Manos, Weston and Picot.

## COUNT I - BREACH OF CONTRACT

121.    Plaintiffs incorporate by reference paragraphs 1 to 120, above, herein.

122.    Hydrogen Master Limited agreed to buy the subject technology from Picot and Manos, who have assigned their interest to Weston for $40,400,000.

123.    The payment for the subject technology was $40,400,000 by Hydrogen Master Rights Limited, including:

> a)     initial payment - $400,000;
>
> b)     validation payment - $1,500,000;
>
> c)     POST PRODUCTION PAYMENT I - $6,000,000;

    d)      POST PRODUCTION PAYMENT II - $12,000,000;

    e)      POST PRODUCTION PAYMENT III - $12,000,000;

    f)      POST PRODUCTION PAYMENT IV - $12,000,000.

124.    Under the agreement, Hydrogen Master Rights was to be given adequate and unrestricted opportunity to meet with and receive information from Dr. Mohanty to assess the assets, technologies, components, combinations, processes, functions and operations to determine whether to proceed with and execute the agreement.

125.    The provisional patent application filed by Mohanty, No. 611365,813, is identified in the Agreement.

126.    Upon information and belief only, the initial payment of $400,000 was made.

127.    Mohanty validated the technology, but the 1.5 million dollar payment was not made.

128.    Hydrogen Master Rights Limited obtained the assets of the sale and validated the technology through Pravansu.

129.    Mohanty confirmed to Weston that he validated the technology.

130.    Defendant Hydrogen Master Rights Limited breached the above described agreement by:

    a)      not paying the balance of the 40 million dollars to Weston as assignee of Picot and Manos.

    b)      falsely claiming the technology didn't work attempting to make and take the technology without paying for it;

    c)      not paying the 1.5 million validation fee.

131.    As a direct and proximate result of the breach of contract by Hydrogen Master, Plaintiff Weston has suffered damages of:

        a)    1.5 million due on validation;

        b)    the balance of the $40,400,000 owing;

        c)    other damages revealed through discovery.

WHEREFORE, Plaintiffs request this Honorable Court to enter judgment in Weston's favor against Hydrogen Master Rights Limited in:

        a)    an amount in excess of $25,000; or

        b)    $1,500,000 in validation payment; or

        c)    the amount of $40,000,000,

        d)    together with costs, interest and attorney fees.

### COUNT II – FIDUCIARY DUTIES

132.    Plaintiffs incorporate by reference paragraphs 1 to 131, above, herein.

133.    Defendant Mohanty owed fiduciary duties to Plaintiffs including, but not limited to:

        a)    obtain patents;

        b)    full disclosure;

        c)    protect and patent the technology;

        d)    not to engage in conflicts of interest;

        e)    duty of loyalty and fidelity;

        f)    to act in Plaintiffs' best interest.

134. The Defendant Mohanty violated fiduciary duties in any or all of the following manners:

      a)      not making full disclosure;

      b)      taking the technology;

      c)      representing the patents did not work;

      d)      not patenting the technology;

      e)      letting the technology patents lapse;

      f)      using the technology and research to create products for Defendants;

      g)      engaging in conflicts of interest;

      h)      other acts revealed through discovery.

135. As a direct and proximate result of the acts of the Defendant Mohanty, Plaintiffs suffered damages past, present, future and/or permanent including, but not limited to:

      a)      validation payments of $1,500,000;

      b)      balance of $40,400,000 under the contract;

      c)      the value of technology;

      d)      expense and investment reimbursement;

      e)      the value of improvements or alternate technology;

      f)      funds paid to Mohanty;

      g)      value of Plaintiff's interest;

      h)      other damages revealed through discovery.

WHEREFORE, Plaintiffs request this Honorable Court to award Plaintiffs in excess of Twenty-five ($25,000) Thousand Dollars together with costs, interest and attorney fees.

## COUNT III - FRAUD

136.    Plaintiffs incorporate by reference paragraphs 1 to 135, above, herein.

137.    In January of 2010, on the first date Weston met Mohanty, Mohanty falsely represented the following material facts:

a)    he would act on our behalf;

b)    we have great technology; things he has never seen;

c)    he will protect the technology (low temp fluid, electrolyte and hydrogen cell) through patents he would obtain;

d)    he would protect the technology formulas and research;

e)    he would not reverse engineer it;

f)    he would not use it for other purposes;

g)    we would not have a problem monetizing the technology to protect our dreams;

h)    he would use the funds paid to him to test, improve and protect the product;

i)    other representations.

138.    Mohanty, in March of 2011, falsely represented to Weston the following material facts that:

a)    he only wanted to deal with Dean, not Picot or Manos, because they lied and tried to scan him;

b)    that he was not talking to Picot or Manos.

139.    Mohanty, in December of 2011, represented to Weston that things are moving fast and Dean should get things in order.

140.    Mohanty repeated these representations throughout the time he dealt with Weston.

141.    Based on these representations, Weston, Picot, Manos and DBHS hired Mohanty to act on their behalf and turned over the technology, research and formulas.

142.    The representations were part of scheme to defraud Weston; Picot and Manos had no intent to carry out the promises.

143.    The representations were material and it was foreseeable Plaintiff would rely on them.

144.    Defendant Mohanty's representations were intentionally false and/or made in reckless disregard of the truth.

145.    Defendant Mohanty intended Weston, Manos and Picot to rely on the statements and it was foreseeable and reasonable that Plaintiff would rely on the statements.

146.    Weston, Manos and Picot relied on the representations by hiring Mohanty and delivering technology to Mohanty.

147.    In the alternative, if the statements were innocently or negligently made, Picot and Manos received a direct financial benefit as a result of the representations and/or resulted in a contract.

148.    In furtherance of the scheme to defraud Plaintiff and/or of the conspiracy:

    a)    Mohanty did not put patents into DBHS, but left them in his name and Manos' name, then concealed his plan to let the patents lapse;

    b)    Mohanty told Manos he never put the asset into Significan Australian or Global; it was controlled by Pravansu;

    c)    Mohanty allowing patents to lapse;

d)   A fire involving the technology that was later covered up and false reports were created;

e)   Creation of multiple sham entities and trusts to conceal the taking of the technology, research and improvements;

f)   Using the technology and the related research to create products Mohanty and Le Souef intend to market through entities or trusts controlled by Mohanty and Le Souef;

g)   There was a coverup of the fire to conceal what was occurring with the technology and a made up a story regarding Carbon nanoparticles as a secret project funded by grants from the armed services and that the investor Carl Le Souef is somehow connected to the technology;

h)   After validating the technology claiming the technology did not work;

i)   After validating the technology claiming funds to be paid for the technology had to be used for more research and development;

j)   Used funds Weston raised for the technology to develop and to fund CSquared and the purchase of the building;

k)   Claiming Weston, DBHS, Manos and Picot's low temperature fluid technology is not related to your new low temperature products being developed even through it has the same characteristics and Mohanty, Le Souef were not involved in this area at all before Weston, Picot, Manos and DBHS;

l)   Mohanty could not provide any explanation as to how Mohanty and Le Souef were suddenly developing this new product which was remarkably similar to Weston, DBHS, Manos and Picot and in an area neither Mohanty or Le Souef were involved in prior to obtaining Plaintiff's technology.

149.   As a direct and proximate result of the acts of the Defendants, Plaintiffs suffered damages past, present, future and/or permanent including but not limited to:

a)   the value of the technology;

b)   1.5 million dollar validation payment;

c)    balance of $40,400,000 owing on the contract;

d)    value of Plaintiff's services;

e)    value of any alternate technology or improvements;

f)    building acquired using funds from Plaintiff;

g)    other damages revealed through discovery.

against Pravansu Mohanty.

WHEREFORE, Plaintiffs request this Honorable Court to award Plaintiffs in excess of Twenty-five ($25,000) Thousand Dollars against Defendants, together with costs, interest and attorney fees.

## COUNT IV - UNJUST ENRICHMENT

150.    Plaintiffs incorporate by reference paragraphs 1 to 149, above, herein.

151.    In the alternative, Defendants Mohanty, Le Souef, Hydrogen Master Rights, Ltd., CSquared Innovations, LLC., Somnio Domus, Somnio Global LLC, Somnio Global L3C, Breakthroughs for Humanity Managements, Inc., Copper Harbor Breakthroughs retained benefits to which they are not entitled to including:

a)    use of funds to purchase the building;

b)    avoiding payment of $40,400,000;

c)    use of funds to finance CSquared and/or Mohanty;

d)    the value of the technology;

e)    value of 1/3 interest in technology;

f)    avoiding the validation payment;

g)    value of the use of Engineering Interests' office;

h)      improvements on the technology and research;

i)      using the funds raised by Weston to develop other technology;

j)      obtaining the building.

152.    It is unjust for Defendant to retain those benefits without paying Plaintiff for them.

153.    The funds raised by Weston were paid to Mohanty through DBHS, an entity owned or controlled by Manos and Picot.

154.    Funds raised by Weston directly or indirectly went into purchasing the building for CSquared.

155.    The subject building is worth more than $12,000,000 and is in the name Somnio Domus, LLC.

156.    The money raised by Weston was paid to Mohanty through Defendant CSquared Innovations at 23164 Commerce Drive, Farmington Hills, MI 48335 by cable to:

Bank of America



including a payment received by Mohanty on or before June 23, 2010 in the amount of $40,000 for design services prototype generator and testing services.

157.    The CSquared building was put in the name of Somnio Domus, LLC, 45145 W. 12 Mile Road, Novi, Michigan.

158.    As direct and proximate result of the acts of the Defendants, Mohanty, Le Souef, CSquared Innovations, Somnio Global, LLC, Copper Harbor, Somnio Domus, Somnio Global, L3C, Breakthroughs for Humanity Management, Inc. and Hydrogen Master Rights Limited, Plaintiff suffered damages including but not limited to:

a) value of technology and improvements;

b) 1.5 million in validation payment;

c) balance of $40,400,000 owing;

d) improvements on technology;

e) alternate technology created while working on the subject technology;

f) amounts paid to Mohanty;

g) value of the building.

WHEREFORE, Plaintiffs request this Honorable Court to:

a) award Plaintiffs in excess of Twenty-five ($25,000) Thousand Dollars together with costs, interest and attorney fees;

b) impose a constructive trust;

c) grant injunctive relief;

d) grant such other relief,

against Le Souef, Mohanty, Hydrogen Master Rights, Ltd., Somnio Global, L3C, Somnio Global, LLC, Breakthroughs for Humanity Management and CSquared Innovations.

### COUNT V - PROMISSORY ESTOPPEL

159. Plaintiffs hereby incorporate paragraphs 1 to 158, above, herein.

160. Defendant Mohanty promised Weston:

a) he would act on behalf of Weston, Manos and Picot;

b) he would patent the technology;

c) he would protect the technology, formulas and research;

d) he would not reverse engineer the technology;

e)   he would not use the technology, research or improvements for other purposes;

f)   along with other promises.

161.   Defendant Mohanty intended Weston to rely and perform based on the promises.

162.   It was foreseeable to Mohanty that Weston would rely on the promises and reasonable for Weston to rely.

163.   Weston did rely on the promises of Mohanty by performing including investment of time, energy and expenditures on marketing, testing, fundraising, developing the technology, making the technology adaptable for use on vehicles and other purposes.

164.   As a direct and proximate result of the acts of the Defendant Mohanty, Plaintiffs suffered damages past, present, future and/or permanent including, but not limited to:

a)   expense reimbursement;

b)   fright and shock;

c)   ear injury from explosion during testing;

d)   mental anguish;

e)   humiliation and embarrassment;

f)   severe emotional distress;

g)   other damages revealed through discovery.

WHEREFORE, Plaintiffs request this Honorable Court to award Plaintiffs in excess of Twenty-five ($25,000) Thousand Dollars against Defendant, Mohanty, together with costs, interest and attorney fees.

### COUNT VI - CONSPIRACY

165.   Plaintiffs hereby incorporate paragraphs 1 to 164, above, herein.

166.    The Defendants Mohanty, Le Souef, Hydrogen Master Rights, Limited, Copper

Harbor, Breakthroughs for Humanity, Somnio Domus, Somnio Global, LLC, Somnio Global L3C,

CSquared Innovations agreed and conspired to:

       a)      take Plaintiff's interest in the technology without paying for it;

       b)      conceal what occurred with the technology and improvements in
the technology;

       c)      commit fraud;

       d)      transfer the technology, revenue, research into entities controlled
by Le Souef and/or Mohanty;

       e)      breach contracts;

       f)      engage in fraudulent transfers.

167.    Defendants, Breakthroughs for Humanity Management, CSquared Innovations,

Somnio Domus, Somnio Global LLC, Somnio Global, L3C, Hydrogen Master Rights, Ltd., Le Souef

and Mohanty, agreed, conspired to and/or engaged in a concerted action to accomplish an

unlawful purpose and/or to accomplish a lawful purpose in a legal manner:

       a)      to take Plaintiff's technology without paying for it;

       b)      to use Plaintiff's technology and research to create new
technology;

       c)      to interfere with Plaintiff's relationship with Picot, Manos and
DBHS;

       d)      to eliminate Plaintiff's involvement in and benefit from the
technology;

       e)      to violate fiduciary duties;

       f)      to commit fraud;

       g)      to engage in fraudulent transfers;

h)    other acts revealed through discovery.

168.    Defendant Le Souef acted in furtherance of the conspiracy by:

a)    eliminating Plaintiff's interest;

b)    using the technology to develop additional technology;

c)    taking control of the technology;

d)    claiming the technology did not work;

e)    setting up multiple entities and trusts to hide assets, technology and research;

f)    engaging in fraudulent transfers;

g)    transferring assets, research and technology to entities owned or controlled by Le Souef or Mohanty.

h)    other acts revealed through discovery.

169.    Defendants Mohanty, Le Souef and HMR:

a)    provided aid, support, encouragement and ratified the acts of the co-conspirators;

b)    had the ability to stop the conspiracy, but concealed the acts and plans of the other co-conspirators from Plaintiff.

170.    Defendant Mohanty acted in furtherance of the conspiracy by:

a)    convincing Plaintiff, Picot and Manos to let Mohanty obtain patents;

b)    putting the patents into Mohanty's name;

c)    eliminating Plaintiff from the group testing, marketing and developing of the technology;

d)    falsely claiming the technology was shelved;

e)    making false representations;

f)      not obtaining patents;

g)      using funds obtained from Weston, Picot, Manos and DBHS to:

      i.      set up and fund CSquared;

      ii.     buy a building.

h)      setting up multiple entities and trusts to hide assets, technology and research;

i)      engaging in fraudulent transfers;

j)      other acts revealed through discovery.

171.    Defendants Copper Harbor, Hydrogen Master Rights, Ltd., Breakthroughs for Humanity Management, Inc., Somnio Domus, Somnio Global, LLC, Somnio Global, L3C and CSquared Innovations:

a)      taking the technology;

b)      marketing the product under other names;

c)      participating in fraudulent transfers;

d)      concealing assets and technologies;

e)      using funds obtained from Plaintiff, Picot, Manos or DBHS to purchase a building.

172.    As a direct and proximate result of the acts of Defendants Le Souef and Mohanty, Plaintiff suffered damages past, present and future, including:

a)      pro rata share of the purchase price of the technology;

b)      value of his assigned interest in the technology from Picot, Manos, Significan, DBHS, Julie Blair of over $40,000,000;

c)      validation payment of $1,500,000;

d)      improvements in technology;

    e)      funds paid to Mohanty;

    f)      improvements in the technology.

WHEREFORE, Plaintiffs request this Honorable Court enter a judgment:

    a)      awarding damages, costs and fees in excess of $25,000;

    b)      $40,400,000 contract price;

    c)      impose a constructive trust on any benefit or profit to Defendants from the technology;

    d)      granting injunctive relief;

    e)      compel a complete accounting;

    f)      prohibit fraudulent transfers;

    g)      return the technology to Weston;

    h)      set aside any fraudulent transfers to third parties or trusts;

    i)      other relief necessary.

against Le Souef, Mohanty, CSquared Innovations, Breakthroughs for Humanity, Copper Harbor,

Somnio Global, LLC, Somnio Global, L3C and Hydrogen Master Rights, Ltd.

<u>COUNT VII – INTENTIONAL INTERFERENCE</u>

173.    Plaintiffs incorporate by reference paragraphs 1 to 172, above, herein.

174.    Plaintiff had existing and advantageous relationships with:

    a)      the subject research and technology;

    b)      Picot and Manos;

    c)      DBHS;

    d)      Mohanty / CSquared.

175.    Defendants Mohanty, Le Souef and Hydrogen Master Rights Limited intentionally and unlawfully interfered with Plaintiff's existing contracts and relationships in any or all of the following manners:

a)    causing Picot and Manos to eliminate Weston;

b)    causing Picot and Manos to sue Weston;

c)    purchasing the technology only from Picot and Manos;

d)    paying only Picot and Manos;

e)    setting up trusts for Picot and Manos;

f)    not obtaining patents for the technology;

g)    letting patent applications lapse;

h)    concealing technology, research and improvements;

i)    engaging in fraudulent transfers;

j)    hiding the technology, assets and research.

k)    using funds obtained from Weston, Picot, DBHS and Manos to fund and operate CSquared;

l)    causing Manos and DBHS and Picot to breach their agreements with Weston;

m)    causing Manos, DBHS and Picot to sue Weston in California;

n)    other acts revealed through discovery.

176.    As a direct and proximate result of the acts of Mohanty, Le Souef and Hydrogen Master Rights Limited, Plaintiff suffered damages past, present, future or permanent, including, but not limited to:

a)    1/3 interest in technology;

b)      1/3 of $440,000 paid;

c)      1.5 million validation payment;

d)      balance of $40,400,000 in payments owing on the technology;

e)      attorney fees in litigating the California case;

f)      amounts paid to Mohanty;

g)      amount of Plaintiff's investments;

h)      value of the technology and improvements;

i)      other damages revealed through discovery.

WHEREFORE, Plaintiffs do hereby request this Honorable to award Plaintiffs damages in excess of $25,000, together with costs and interest.

### COUNT VIII - ORAL CONTRACT

177.    Plaintiff incorporates by reference paragraphs 1 to 176, above, herein.

178.    Plaintiff Weston individually and/or as an assignee of Picot, Manos, DBHS and Significan contracted with Pravansu Mohanty to perform services in exchange for funds paid to and received by Mohanty over $500,000, including, but not limited to:

a)      protect the technology;

b)      improve the technology;

c)      test the technology;

d)      patent the technology;

e)      monetize the technology;

f)      not to sue the technology for other purpose;

g)      act on behalf of Weston, Manos, Picot and DBHS.

179.    Pravansu Mohanty breached the above described duty in any or all of the following manners, including, but not limited to:

      a)    taking the technology;

      b)    acting in his own best interest;

      c)    eliminating Plaintiff's interest;

      d)    concealing the technology;

      e)    falsely claiming the technology did not work;

      f)    attempting to market the technology under different names and through different entities;

      g)    letting the patents lapse;

      h)    using funds to finance CSquared;

      i)    using the funds to purchase a building;

      j)    other acts revealed through discovery.

180.    As a direct and proximate result of the acts of the Defendant, Plaintiff Weston suffered damages past, present, future, including, but not limited to:

      a)    loss of 1/3 of $400,000;

      b)    $1,500,000 validation payment;

      c)    balance of $40,400,000;

      d)    loss of value of technology;

      e)    amounts paid to Mohanty.

WHEREFORE, Plaintiff Weston requests this Honorable Court to enter judgment in Plaintiff's favor against Defendant Pravansu Mohanty, in an amount in excess of $25,000, together with costs and fees.

/s/ William Dobreff
**WILLIAM DOBREFF (P35263)**
Attorney for Plaintiffs
44511 N. Gratiot Avenue
Clinton Township, MI 48036
(586) 838-3880

Date:  March 29, 2016

## JURY DEMAND

Plaintiffs do hereby demand a jury in the above entitled action.

/s/ William Dobreff
**WILLIAM DOBREFF (P35263)**
Attorney for Plaintiffs
44511 N. Gratiot Avenue
Clinton Township, MI 48036
(586) 838-3880

Date:  March 29, 2016