IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HYRDOGEN MASTER RIGHTS, LTD.,       )
CARL  LE  SOUEF  and  PRAVANSU      )
MOHANTY, PH.D.,                     )
                                    )
        *Plaintiffs*,               )        Civ. No. 16-474-RGA
                                    )
    v.                              )
                                    )
DEAN WESTON, ENGINEERING            )
INTERESTS, LLC, PAUL DAVID          )
MANOS, SIGNIFICAN GLOBAL            )
ENERGY INTELLECTUAL PROPERTY        )
TRUST, SIGNIFICAN AUSTRALIA         )
ENERGY INTELLECTUAL PROPERTY        )
TRUST, TRACY COATS, and THE         )
CLIENT IS EVERYTHING, LTD.,         )
                                    )
        *Defendants*.               )

## MEMORANDUM

Defendant Tracy Coats moves to disqualify David T. Movius and his law firm McDonald

Hopkins LLC from acting as counsel for plaintiffs Hydrogen Master Rights, Ltd. ("HMR"), Carl

Le Souef, and Pravansu Mohanty. (D.I. 15). Coats, Le Souef, and Mohanty are former partners.

(D.I. 22 ¶¶ 28, 49). Movius and McDonald Hopkins represented the former partners and HMR in

connection with their purchase of certain hydrogen technology (the "Hydrogen Technology") from

defendants Paul David Manos, Significan Global Energy Intellectual Property Trust, and

Significant Australia Energy Intellectual Property Trust (the "Sellers"). (D.I. 16 at 1). Coats

claims that Movius and McDonald Hopkins should therefore be disqualified based on Model Rules

1

of Professional Conduct 1.9(a) and 3.7. For the reasons stated below, Coats' motion to disqualify is granted.

## I.    BACKGROUND

### A.    The Partners Hire McDonald Hopkins

According to Plaintiffs, in late 2010, Coats, Le Souef, and non-party Rodney Adler formed a general partnership for purpose of licensing and developing the Hydrogen Technology. (D.I. 22 at ¶ 28). The partnership does not have a name. Mohanty joined the partnership sometime the following year. (D.I. 23 at 2). The partners used an entity formed by Coats called International Business Knowledge Exchange, Ltd. (Del.) to acquire the worldwide licensing rights to the Hydrogen Technology in April 2011. (D.I. 23 at 2). An attorney from Jones Day represented the partners in connection with the licensing transaction. (*Id.*). Over the next few months, the partners created several additional entities to carry out their business. Breakthroughs for Humanity Management, Inc. was formed in May 2011 to serve as the partnership's operating entity.[1] (D.I. 23-1, Ex. 3 ¶ 8). At the same time, Copper Harbor Breakthroughs, Inc. was formed to hold the partnership's non-hydrogen intellectual property. (*Id.*). Finally, in August 2011, the partners formed HMR as a vehicle to purchase the Hydrogen Technology outright. (D.I. 23 at 2).

According to Plaintiffs, Coats reached out to Movius, based on a referral, when the partners received a legal threat from a third-party relating to a different hydrogen technology (the "Mendez Dispute"). (D.I. 23 at 2-3). After meeting with Movius, Coats recommended that the partners

---

[1]    The dates on which the entities were created are from the records published by the Delaware Secretary of State. The court may take judicial notice of matters of public record, including public filings with a government agency. *Nikolouzakis v. Exinda Corp.*, 2012 WL 3239853, at *3 (D. Del. Aug. 7, 2012).

2

engage McDonald Hopkins as their primary legal counsel for their "entire suite of business." (*Id.*).

The other partners agreed. (*Id.*).

The engagement letter states that McDonald Hopkins was retained "to represent all of you

in the formation and operation of a new legal entity." (D.I. 18-4 at 1). Because that new entity

did not yet legally exist, it was not named as the client for the purposes of the engagement letter.

In addition, the partners apparently decided that the engagement letter should not be addressed to

any of their pre-existing entities, including HMR. Instead, the engagement letter, dated October

28, 2011, is addressed to the four individual partners "as a group." (D.I. 18-4 at 1). Specifically,

it states:

> The scope of this engagement initially involves representation of the four
> Owners as a group in the formation of the Entity. Once the Entity has been
> formed, we will no longer represent the Owners individually with respect to any
> Entity matters.

(*Id.*). The engagement letter reiterated that the client was the individual owners as a group until

after an entity was formed. Specifically, it stated:

> [W]e will initially represent the four Owners as a group and will later represent
> the Entity once it has been formed. Each of you hereby consents to our initial
> representation of the four Owners and later representation of the Entity
> following formation.

(D.I. 18-4 at 3). The engagement letter also contained several warnings regarding potential

conflicts of interest between the individual partners. Specifically, the letter warned that:

> When representing the four Owners as a group, we will not be in a position to
> advocate the interests of any one Owner as against the others. If your interests
> begin to diverge and these points of divergence become too significant, we may
> be required to cease our representation of the Owners as a group and each of you
> may then need to retain new counsel.

(*Id.* at 1). The engagement letter reiterated: "we will not be representing or otherwise serving as

an advocate for any Owner in matters involving the Entity." (*Id.* at 3). Finally, the engagement

letter contained a broad waiver of conflict, stating: "Each of you hereby waive forever each and

3

every conflict of interest, which now exists, due to, or hereafter may arise out of, this firm's representation of the Entity and any Owners (or affiliates)." (*Id.*).

## B. McDonald Hopkins' Work on the Purchase Agreement

Plaintiffs claim that McDonald Hopkins' representation effectively kicked off on November 7, 2011, with an extended conference call between Coats, Movius, and another McDonald Hopkins attorney to discuss the partners' business structure and action items. (D.I. 23 at 5-6). Invoices, however, show that McDonald Hopkins started working on various legal issues for the partners as early as November 1, 2011, and consistently performed some legal work on almost every business day thereafter. (D.I. 18-5, Ex. E).

According to Plaintiffs, Le Souef and Coats explicitly asked Movius to represent the partners in connection with the Hydrogen Technology acquisition, including the negotiation and drafting of the Purchase Agreement, on November 21, 2011. (D.I. 23 at 7). Movius indicated that HMR would need to formally engage him, because HMR was the only buyer named in the Purchase Agreement. (*Id.*). Le Souef and Coats purportedly decided, however, that they could use the existing engagement letter and substitute HMR for the "Entity" referred to in that letter. (*Id.*).

There are some problems with Plaintiffs' version of the facts. First, Movius provided legal advice to the partners regarding the Purchase Agreement before the apparent substitution of HMR for the "Entity" referred to the engagement letter. Invoices show that on November 11, 2011, Movius spent time on "correspondence regarding the Hydrogen Asset Agreement" and a "teleconference with T. Coats." (*Id.*). Then, on November 20, 2011, Movius spent time on "review and analysis of Hydrogen Asset Purchase Agreement and comments to same." (*Id*). More

importantly, Plaintiffs themselves state that Movius was asked to consider HMR as the "Entity" only "*[a]fter* Movius provided his comments" to the Purchase Agreement. (*Id.* (emphasis added)).

Second, substituting HMR for the "Entity" is inconsistent with the language of the engagement letter. The letter says, "Thank you for choosing McDonald Hopkins LLC to represent all of you in the formation and operation of a *new* legal entity." (D.I. 18-4 at 1) (emphasis added). The letter also says, "Once the Entity has been formed, [McDonald Hopkins] will no longer represent the Owners individually." (*Id.*). Because HMR already existed at the time the engagement letter was executed, by its own terms McDonald Hopkins would never have represented the owners individually, making any references to individual representation and individual conflicts of interest superfluous. For these reasons, the court questions the significance that can be placed on the events that purportedly transpired on November 21, 2011.

### C. The Conspiracy and Extortion

Plaintiffs allege that after Coats withdrew from the partnership in 2014, he entered into a conspiracy with defendants Manos and Weston to extort Plaintiffs.[2]   (D.I. 22 ¶ 101). Plaintiffs also allege that Weston told Mohanty that he owned a partial interest in the Hydrogen Technology, granted to him by Sellers before execution of the Purchase Agreement. (*Id.* at ¶¶ 71-76). This was news to Plaintiffs, because the Purchase Agreement included representations and warranties stating that no one but HMR had any right, title, or interest in the Hydrogen Technology, other than the rights and interests granted under three identified agreements, including the license agreement with IBKE (Del.). (*Id.* at ¶ 74; D.I. 32 at A14). In addition, Weston purportedly used recordings made by Coats to threaten Mohanty and Le Souef with personal and professional

---

[2]     Adler has also withdrawn from the partnership, leaving Le Souef and Mohanty as the current partners. (D.I. 22 ¶¶ 93, 100).

embarrassment, criminal convictions, loss of citizenship and other harms unless Plaintiffs agreed (i) to pay Weston $9.4 million, (ii) to assign him the Hydrogen Technology, and (iii) to assign him multiple unrelated patent-pending technologies. (D.I. 22 ¶ 121).

## II. STANDARD OF REVIEW

The court has the inherent authority to supervise the professional conduct of attorneys appearing before it, including the power to disqualify an attorney from a representation. *Microsoft Corp. v. Alcatel Bus. Sys.*, 2007 WL 4480632, at *1 (D. Del. Dec. 18, 2007); *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980). Motions to disqualify are "generally disfavored" and, therefore, require the moving party to show clearly that "continued representation would be impermissible." *Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*, 491 F. Supp. 2d 510, 513 (D. Del. 2007). Because "[t]he maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is so important," however, a court may disqualify an attorney "for failing to avoid even the appearance of impropriety." *Kabi Pharmacia AB v. Alcon Surgical, Inc.*, 803 F. Supp. 957, 960 (D. Del. 1992).

## III. DISCUSSION

Attorney conduct before this court is governed by the Model Rules of Professional Conduct of the American Bar Association ("Model Rules" or "MRPC"). D. Del. LR 83.6(d); *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir. 1984). Defendants seek disqualification based on Model Rules 1.9(a) and 3.7. The court finds that disqualification is appropriate under Model Rule 1.9(a), because there is a conflict of interest between former and current clients. Therefore, the court does not address Model Rule 3.7, which addresses whether an attorney will be a necessary witness at trial.

Model Rule 1.9(a) states:

6

> A lawyer who has formerly represented a client in a matter shall not thereafter
> represent another person in the same or a substantially related matter in which
> that person's interests are materially adverse to the interests of the former client
> unless the former client gives informed consent, confirmed in writing.

Accordingly, a lawyer will be disqualified under Model Rule 1.9(a) when the moving party

shows that: (1) the lawyer had an attorney-client relationship with the former client; (2) the current

client's matter is either the same or substantially related to the former client's matter; (3) the

interests of the current client and former client are materially adverse; and (4) the former client has

not consented to the representation. *Apeldyn Corp. v. Samsung Elecs. Co., Ltd.*, 660 F. Supp. 2d

557, 561 (D. Del. 2009). In this case, the parties dispute all of these elements except the third,

because "[t]here is no situation more 'materially adverse' than when a lawyer's former client is an

adverse party in a lawsuit against that lawyer's current client." *In re David Cutler Indus., Ltd.*,

432 B.R. 529, 542 n. 16 (Bankr. E.D. Pa. 2010). The remaining three elements will be addressed

in turn.

### A. Attorney Client Relationship

Plaintiffs argue that Movius and McDonald Hopkins represented the general partnership

until November 21, 2011 and, after that date, HMR. (D.I. 23 at 13). "Normally, the most critical

fact or circumstance used to determine if an attorney-client relationship exists would be an express

agreement for legal services between the parties." *Milner v. Anders*, 2001 WL 637394, at *4 (D.

Del. May 10, 2001). Here, this critical fact strongly indicates an attorney-client relationship with

the individual partners and not a partnership entity. The engagement letter is replete with express

language stating that McDonald Hopkins is jointly representing four individuals. For example,

the letter states that McDonald Hopkins was retained to represent "the four Owners as a group"

and it would stop representing the "Owners individually" only after the entity was legally formed.

(D.I. 18-4 at 1). In warning about potential conflicts of interest, the letter again refers to a group

7

of four individuals, stating: "we represent all four Owners as a group …." (*Id.*). The letter expressly labels the engagement a joint representation, stating: "By participating in this joint representation, the protection of the attorney client privilege will not apply among you as the jointly represented clients with regard to the subject of this engagement." (*Id.*). Finally, the engagement letter consistently uses the plural "Owners," rather than the singular "Owner," to reflect that the law firm was representing four individuals and not any single entity or association. (D.I. 18-4 *passim*). The engagement letter is addressed to each individual partner at their email address and not to any entity. (D.I. 23-1 Exs. 10 – 11). All four partners signed the engagement letter in their individual capacity. (*Id.*). No titles are indicated for any individual.

Plaintiffs argue that, under Model Rule 1.13, McDonald Hopkins could not have had an attorney-client relationship with the individual partners. (D.I. 23 at 12). Model Rule 1.13 states that: "A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents." The ABA is "of the opinion that a partnership is an organization within the meaning of Rule 1.13," because a partnership "is a separate jural entity having distinct rights and duties."[3] ABA Formal Op. 91-361 (1991). Thus, "a lawyer who represents a partnership represents the entity rather than the individual partners unless the specific circumstances show otherwise." ABA Formal Op. 91-361 (1991); *see also Concordia Partners, LLC v. Ward*, 2012 WL 3229300, at *6 (D. Me. Aug. 6, 2012) ("By creating a separate legal entity with isolated liabilities, a corporation (or, in this case, a [partnership]) becomes a stand-alone entity to which the lawyer owes a duty of loyalty and independent judgment.").

---

[3]     Jural means: (1) "Of, relating to, or involving law or jurisprudence; legal; and (2) "Of, relating to, or involving rights and obligations." Black's Law Dictionary (10th ed. 2014).

Here, specific circumstances suggest that McDonald Hopkins did not have an attorney-client relationship with a partnership entity. As conceded at oral argument, the partners never formalized the legal existence of the partnership by, among other things, executing a partnership agreement, obtaining a business license from the state, filing a certificate of formation with the state, or obtaining an employer identification number from the IRS. In forming its opinion, the ABA relied on the fact a partnership, as a separate legal entity, is "capable ... of entering into contracts and either bringing suit or being sued in its own name." ABA Formal Op. 91-361 (1991). But Plaintiffs' partnership has not exercised any rights or duties in its own name by, for example, entering into contracts and bringing suit. (D.I. 25 at 8). Indeed, the partnership does not even have a name. Instead, Le Souef and Mohanty have brought claims in their own name and derivatively on behalf of the unnamed partnership (D.I. 22 ¶¶ 223, 233), even though they would have the power as the only remaining partners to cause the partnership, if it existed, to sue in its own name.[4] *See, e.g.*, 6 *Del. C.* § 15-307 ("A partnership may sue and be sued in the name of the partnership."); 6 *Del. C.* § 15-401 (a matter in the ordinary course of partnership business is decided by majority vote).

It is not surprising that the partnership has not asserted itself as a separate legal entity, because McDonald Hopkins was retained to help the partners formalize the legal existence of their partnership. As Plaintiffs explain, at the time they retained Movius, "the Partnership had not executed a master partnership agreement, and it was seeking advice on how its business should be structured." (D.I. 23 at 3). Where a group of individuals retained a law firm to form a partnership,

---

[4]     Interestingly, Plaintiffs amended the complaint after Coats filed his motion to disqualify to add that the individual plaintiffs were bringing Count 13 (breach of fiduciary duty) and Count 14 (breach of contract) individually and on behalf of the partnership whereas, before the amendment, the claims were asserted only individually. (*Compare, e.g.*, D.I. 1 ¶ 209 & D.I. 22 ¶ 234).

9

the Fifth Circuit has held that the law firm "represented them individually until the formation of the partnership," and "[o]nce the partnership was in place," any prior attorney-client relationship with the individuals was preempted. *Hopper v. Frank*, 16 F.3d 92, 97–98 (5th Cir. 1994). McDonald Hopkins' engagement letter is consistent with this concept. It states: "The scope of this engagement initially involves representation of the four Owners as a group in the formation of the Entity. Once the Entity has been formed, we will no longer represent the Owners individually with respect to any Entity matters." (D.I. 18-4 at 1).

At oral argument, Plaintiffs correctly pointed out that Delaware law recognizes oral agreements to form a partnership. *See, e.g., Grunstein v. Silva*, 2011 WL 378782, at \*9 (Del. Ch. Jan. 31, 2011); *Active Asset Recovery, Inc. v. Real Estate Asset Recovery Serv.*, Inc., 1999 WL 743479, at \*5 (Del. Ch. Sept. 10, 1999); *King v. Hajali*, 1993 WL 488233, at \*1 (Del. Ch. Nov. 12, 1993); *Kehnast v. Kehnast*, 85 A.2d 357, 358 (Del. Ch. 1952). The complaint does not allege, however, that the former partners, who are residents of Australia, Michigan, and Nevada, agreed to form a partnership under Delaware law. Thus, it is unclear if Delaware law even applies.

Nevertheless, assuming that Delaware law does apply, under 6 *Del. C.* § 15-202(a), a partnership is formed through "the association of two or more persons (i) to carry on as co-owners a business for profit ... whether or not the persons intend to form a partnership...." *Ramone v. Lang*, 2006 WL 4762877, at \*12 (Del.Ch. Apr. 3, 2006). To create a partnership, the purported partners must intend "to share losses and profits, control, and ownership." *Grunstein v. Silva*, 2014 WL 4473641, at \*16 (Del. Ch. Sept. 15, 2014); *Hill v. Harris*, 1998 WL 960763, at \*2 (Del. Super. Oct. 27, 1998) (stating that the existence of a partnership is demonstrated by "profit sharing, co-ownership, and joint control"). A court cannot conclude that a partnership existed unless there was "a common obligation to share losses as well as profits." *Ramone*, 2006 WL 4762877, at \*12.

10

"Where the suit is between the parties as partners, stricter proof is required of the existence of a partnership than where the action is by a third person." *Id.*

Ultimately, there are no allegations in the complaint or sworn declarations that the parties shared ownership, control, and profits and losses. Plaintiffs have submitted evidence that the parties used the term "partners" in their everyday communications, which Coats asserts was used in a colloquial sense. (*See, e.g.*, D.I. 23-1, Exs. 5 & 7). Even if the term "partners" was not being used in a colloquial sense, this fact alone is not sufficient to allege the existence of an oral partnership agreement. Thus, under the totality of the circumstances, the court concludes that the partnership in this case is not an "organization" for the purposes of Model Rule 1.13.

Finally, both parties argue over who paid McDonald Hopkins' invoices. (D.I. 16 at 8; D.I. 23 at 14). The Model Rules, however, recognize that "[a] lawyer may be paid from a source other than the client...." MRPC 1.7 cmt. 13 (referring to MRPC 1.8(f)). Because payment of invoices alone does not create an attorney-client relationship, the court will not parse through these facts. In conclusion, the court finds that Movius and McDonald Hopkins had an attorney-client relationship with the individual partners, including Coats.

## B. Substantially Related Matters

Matters are "substantially related" if: (1) "they involve the same transaction or legal dispute," or (2) "there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." MRPC 1.9 cmt. 3. While the party seeking disqualification bears the burden of establishing the existence of a substantial relationship, any doubts about whether disqualification is appropriate should be resolved in favor of the moving party, in order to ensure protection of client confidences. *Sonos, Inc. v. D & M Holdings Inc.*, 2015 WL 5277194,

11

at \*2 (D. Del. Sept. 9, 2015). Here, the court finds that the two matters "involve the same transaction."[5]

The Purchase Agreement is an essential element of several of Plaintiffs' claims against Coats, and was also the subject matter of McDonald Hopkins' prior representation of Coats. (D.I. 16 at 8). For example, Count 30 is for "civil conspiracy." (D.I. 22 ¶¶ 339-46). Paragraph 15 of the complaint states: "the Court has personal jurisdiction over Coats due to his conspiracy with Weston as alleged herein that relates, at least in part, to the Purchase Agreement." (*Id.* at ¶ 15). Similarly, Count 31 alleges that all of the defendants "intentionally aided and abetted each other in committing wrongful acts and omissions against" Plaintiffs. (*Id.* at ¶¶ 347-52). Plaintiffs further allege, "By aiding and abetting each other's wrongdoing, each Defendant is liable as if it had committed all of the wrongful acts and omissions itself." (*Id.* at ¶ 351). Count 31 is not limited to any other particular claim in the complaint. As a result, if the court incorporates Count 1 (breach of the Purchase Agreement) and Count 5 (rescission of the Purchase Agreement) into Count 31, as the complaint instructs, then Plaintiffs essentially allege that Coats breached the Purchase Agreement and is liable for rescission of that agreement. (*Id.* at ¶¶ 141-52, 174-76)

As Coats points out, the commentary to Model Rule 1.9(a) describes this exact situation as an example of a rule violation. (D.I. 16 at 7-8). Specifically, the commentary states: "Under this Rule ... a lawyer could not properly seek to rescind on behalf of a new client a contract drafted on behalf of the former client." MRPC 1.9 cmt. 1. "Nor could a lawyer who has represented multiple clients in a matter represent one of the clients against the others in the same or a substantially

---

[5]     The Model Rules describe two disjunctive grounds for finding matters substantially related. Because the court finds that the matters "involve the same transaction," it need not address whether there is a "substantial risk" confidences obtained in the prior presentation would materially advance Plaintiffs' position in this matter.

12

related matter after a dispute arose among the clients in that matter, unless all affected clients give informed consent." *Id.* Accordingly, the court finds McDonald Hopkins' representation of Plaintiffs is substantially related to the matter it worked on for Coats. McDonald Hopkins will be disqualified from representing Plaintiffs, unless Coats gave informed consent.

### C. Consent

Under Model Rule 1.9, a lawyer may represent a current client in a substantially related matter if "the former client gives informed consent, confirmed in writing." Plaintiffs argue that Coats gave informed consent in advance by signing the engagement letter which states: "Each of you hereby waive forever each and every conflict of interest, which now exists, due to, or hereafter may arise out of, this firm's representation of the Entity and any Owners (or affiliates)." (D.I. 23 at 18; D.I. 18-4 at 3).

The effectiveness of advance consent, sometimes called a prospective waiver, "is generally determined by the extent to which the client reasonably understands the material risks that the waiver entails."[6] MRPC Rule 1.7 cmt. 22. "If the consent is general and open-ended, then the consent ordinarily will be ineffective, because it is not reasonably likely that the client will have understood the material risks involved." MRPC 1.7 cmt. 22. On the other hand, if the client is an experienced user of the legal services involved, a general and open-ended consent is more likely to be effective if, among other things, "the client is independently represented by other counsel in

---

[6]     The comments to Model Rule 1.9 state that "[w]ith regard to the effectiveness of an advance waiver, see Comment [22] to Rule 1.7." MRPC 1.7 cmt. 9.

giving consent and the consent is limited to future conflicts unrelated to the subject of the representation."[7] *Id.*

Here, Coats gave general and open-ended consent. Although Coats may be an experienced user of the legal services involved, particularly considering that he is the one who found Movius and recommended him to the other partners, Coats was not independently represented when he gave his advance consent and the advance consent was not limited to future conflicts unrelated to the subject of the representation. Indeed, the court has already concluded that this matter and the prior matter are substantially related. For all of these reasons, the court finds that Coats did not give informed consent under Model Rule 1.9. Accordingly, Movius and McDonald Hopkins are disqualified from representing Plaintiffs in this matter.

## IV.    CONCLUSION

For the foregoing reasons, Coats' motion to disqualify David T. Movius and his law firm McDonald Hopkins LLC from acting as counsel for Plaintiffs is granted. (D.I. 15). An appropriate order will be entered.

Dated: December 22, 2016

*[signature]*

UNITED STATES DISTRICT JUDGE

---

[7]     Plaintiffs cite *Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.*, 142 F.Supp.2d 579, 583 (D. Del. 2001) for the proposition that "a prospective waiver should identify the potential opposing party, the nature of the likely subject matter in dispute, and permit the client to appreciate the potential effect of the waiver." (D.I.  23 at 17). *Elonex* relied on a case from the Western District of Michigan which itself relied on Formal Opinion 93-372 from the ABA Committee on Ethics and Professional Responsibility. *Kalamazoo v. Mich. Disposal Serv. Corp.*, 125 F. Supp. 2d 219, 243 (W.D. Mich. 2000). In May 2005, the ABA withdrew Formal Opinion 93-372, because Model Rule 1.7 was amended in February 2002. ABA Formal Op. 05-436. This calls into doubt whether the analysis in *Elonex* would still be the same under the current Model Rule 1.7. The court need not resolve the issue, however, because the commentary for the current Model Rule 1.7 provides sufficient guidance.